Filed 3/20/13  In re A.T. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re A.T. et al., Persons Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E057016 |
| Plaintiff and Respondent, | (Super.Ct.No. RIJ119719) |
| v. | O P I N I O N |
| S.T., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  S. Patricia Spear, Judge.

(Retired judge of the Los Angeles Super. Ct. assigned by the Chief Justice pursuant to art.

VI, § 6 of the Cal. Const.)  Affirmed.

William Hook, under appointment by the Court of Appeal, for Defendant and

Appellant.

1

Pamela J. Walls, County Counsel, and Julie Koons Jarvi, Deputy County Counsel, for Plaintiff and Respondent.

Defendant and appellant S.T. (Mother) appeals from an order terminating her parental rights with respect to her four children, A., So., Se., and O. The order was made at a hearing held pursuant to Welfare and Institutions Code section 366.26.[1] She contends the court abused its discretion when it found the beneficial parental relationship exception to adoption did not apply. We reject the argument and affirm the court's orders.

## I. FACTUAL AND PROCEDURAL SUMMARY

A. *Detention, Jurisdiction, and Disposition*

Mother's child Se. was born in April 2010, and placed in the neonatal intensive care unit (NICU) of the hospital. Hospital staff noted that Se. "'appear[ed] to be experiencing withdrawal symptoms'" and that Mother "'never seemed to bond with the baby.'" Se. tested positive for methamphetamine.

At the time of Se.'s birth, Mother had custody of her children A. (four years old) and So. (22 months old). At that time, the children were living with a maternal aunt and maternal great-aunt.

A social worker and a police officer went to Mother's residence, where she lived with her mother. She denied using any methamphetamine while pregnant. She also

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2

denied more recent use. However, when the police officer conducted a field sobriety test on her and found her under the influence of a controlled substance, she admitted using methamphetamine earlier that day. The social worker informed Mother that Se., So., and A. would be placed into protective custody because of her substance abuse and severe neglect toward Se.

Se. and So. had one father; A., another. Mother was married to Se. and So.'s father, but they were separated. In addition to Se. and So., they had another child, J., who lived with the father. The father was not willing to take custody of Se. and So. because he was unemployed and unable to provide for them.

A.'s father was in prison and had no relationship with his child.

On May 4, 2010, plaintiff and respondent, Riverside County Department of Public Social Services (DPSS), filed a dependency petition under section 300 as to Se., So., and A. The petition alleges dependency jurisdiction based on the parents' failure to protect the children (§ 300, subd. (b)), and lack of support (§ 300, subd. (g)).

Following a hearing, the court ordered the children detained. The two older children were placed together in a foster home. The infant Se. was placed in a "medically fragile home."

In a report prepared for the jurisdictional and dispositional hearing, the social worker stated that Mother "is addicted to debilitating illegal drugs," "has a history of criminal activity and jail time," and "leads a dangerous lifestyle." Her "only visible support system and only visible means of financial support is found in illegal drugs and

3

street life." However, Mother had enrolled in a substance abuse treatment program and appeared to the social worker to be "very motivated to get her children home . . . ."

At the jurisdictional/dispositional hearing held in July 2010, the court sustained the petition, declared the children dependents of the court, and removed them from their parents. Mother was provided with reunification services. Services were not provided to A.'s father because he had been convicted of a violent felony. (See § 361.5, subd. (b)(12).) Se. and So.'s father waived his right to services under section 361.5, subdivision (b)(14).

B. *Six-month Review*

In a status review report for the six-month review hearing, the social worker reported that Mother was pregnant. Mother's progress in her treatment programs was described as "shaky," with unauthorized absences and late arrivals. She twice tested positive for drugs and admitted she would test positive on a third date. Nevertheless, she was able to graduate to the next phase of the program.

Visits between Mother and the children were scheduled for twice each week. Mother appeared for most visits, although she missed several visits without informing the foster parents or the social worker. The older children were reportedly "quite a handful when in the presence of [Mother]," who did "not seem to have much control of both of them at the same time."

At the six-month review hearing, the court continued reunification services for Mother.

4

C. *Twelve-month Review and Detention of Newborn O.*

In April, 2011, the infant Se. no longer required a medically fragile home and was placed in a foster home near Mother.

Mother changed her substance abuse program to accommodate her pregnancy. By May 2011, she was promoted to phase 4 of the program and looking forward to graduation.

In the time between the six-month and 12-month review periods, visits with the older children increased to overnight visits. According to the social worker, Mother and the maternal grandmother "have caused some difficulties," including wrongfully accusing the foster parents of abuse. The social worker further stated that the children significantly increased their acting out behaviors after visits and A., the older boy, would use "many curse words" after returning from visits. It would take several days to calm the daughter So. A. told the social worker he was hungry during visits, that Mother is often sleeping, and they are not allowed to play outdoors.

Mother had twice weekly visits with Se., the infant. The social worker noted that Mother would call the foster parents to schedule visits, then cancel abruptly without rescheduling.

Mother's fifth child, O., was born in June 2011. Three days after O.'s birth, DPSS filed a dependency petition concerning her under section 300, subdivisions (b) (failure to protect) and (j) (abuse of sibling). An amended petition adding an allegation under

5

section 300, subdivision (g) (no provision for support) was filed on July 29, 2011. (O.'s father is not the father of Mother's other children.)

In a detention report, the social worker noted that Mother and O. tested negative for drugs. Mother had good prenatal care and was bonding well with O. Mother was making progress on her case plan and attends Alcoholics Anonymous and Narcotics Anonymous meetings. Mother told the social worker she has completed two substance abuse programs and believes she will be a better parent now that she is parenting sober. Mother's sober house manager told the social worker that Mother's random drug tests have been clean and that Mother "appears to really understand the dynamics of drug use and sobriety, and that she believes [Mother] wants to remain clean and sober."

At a detention hearing regarding O., DPSS recommended that the infant remain with Mother and be detained from the father only. The court agreed.

The jurisdictional and dispositional hearing regarding O. was held the same day as the 12-month review hearing for the other three children. At the jurisdictional and dispositional hearing, the court sustained the petition and declared O. a dependent of the court and ordered family maintenance services for Mother. Mother retained custody of the infant.

Following the 12-month review hearing, the court found that Mother's progress had been adequate but incomplete, and ordered continuation of reunification services.

D. *Eighteen-month Review Period*

In August 2011, the three children who had been living in foster homes were returned to Mother's care. According to the social worker, Mother's "dogged pursuit of case plan services and her dedication to reunify with her children was pivotal in allowing [DPSS] to place the children back in her care."

Mother completed a counseling program and her random drug tests were negative.

At the 18-month review hearing, the court found that Mother's progress toward alleviating the causes necessitating placement was satisfactory in that she had made substantive progress or completed her case plan. DPSS was ordered to provide family maintenance services.

E. *Supplemental Petition*

On November 21, 2011, the social worker received information that Mother was using drugs and "out late at night with the baby, [O.]." Two days later, the social worker met with Mother and gave her a random drug test, which showed positive for methamphetamine and amphetamines. Mother told the social worker she used drugs each of the two preceding days. Mother said she used drugs because of the stress of having the children placed with her and having no one to help. The social worker placed the children in protective custody. All four children were placed together in one foster home. The court detained the children on November 30, 2011.

Mother arrived late to the first visit with several female companions, children, and two male companions. The foster mother was concerned about "the mood of the visit and

7

the vibes of hostility she felt from the family." Mother complained about spots on O.'s ear and told the social worker she thought the children were being drugged.

DPSS filed a supplemental petition under section 387 for a more restrictive placement concerning the four children on November 29, 2011. DPSS alleged that the prior disposition had not been effective because Mother "continues to abuse controlled substances and testified positive for methamphetamine on or about November 23, 2011."

At the jurisdictional/dispositional hearing on the supplemental petition, DPSS recommended that family maintenance services be terminated and that Mother be denied family reunification services.

The court sustained the petition, adopted DPSS's recommendations, and set a hearing to be held pursuant to section 366.26.

F. *Section 366.26 Proceedings*

In a report prepared for the section 366.26 hearing, the social worker describes recent visits between Mother and the children as "negative and chaotic." Initially, visits were held at a fast food restaurant and supervised by the foster mother. However, Mother came with others who had not been approved for visits, and the foster mother felt that Mother and the maternal grandmother were hostile toward her. Visits were then moved to a foster family agency (FFA) office. Mother needed the assistance of the FFA staff and Mother's companions in supervising, feeding, and keeping the children safe.

Mother would begin the visits by bringing large quantities of food, including soda, chips, candy, popcorn, donuts, juice, pizza, and hot dogs. She expected the children to

8

eat everything and if they showed displeasure at the food, Mother became upset, causing the children to act up. Despite being counseled on more positive ways to begin visits, Mother continued to start visits this way.

The maternal grandmother came to some visits disheveled, tired, perspiring profusely, and appearing to be under the influence of an unknown substance. Mother is agitated when the maternal grandmother is there and becomes more limited in dealing with the children. Mother's expectations regarding the children grow more unreasonable and the visits disintegrate into one disciplinary action after another.

A., who is six years old at this time, was initially withdrawn from Mother and expressed a desire to go home. FFA staff were able to get him to enjoy visits more. When the child is unable to fulfill Mother's expectations, Mother ignores him, causing A. to withdraw and cry. The effects of the visits on the other children are similar. Three-year-old So.'s behavior deteriorates and she is relieved to go home to the foster parent. Two-year-old Se. throws tantrums and, by the end of the visit, is tired and ready to return to the foster home. Mother will continue to feed nine-month-old O. despite the infant's signs that she is not hungry.

DPSS recommended that visits between Mother and the children be discontinued.

The prospective adoptive parents for the children are the current caregivers. According to the social worker, they "are extremely bonded to these children and consider them as part of their family." "They are very committed to adopting the children and providing them with a permanent home."

9

At the section 366.26 hearing, Mother testified that she and the children will play together during visits and watch movies together. The three children who are old enough to talk call her "mommy." At the end of visits, her daughter So. will say she wants to go home with the maternal grandmother. She has made it to most of her scheduled visits, although she has missed some due to scheduling problems.

The court found that the children were adoptable. Mother argued that the court should select legal guardianship as the permanent plan, not adoption, based on the beneficial parental relationship exception to adoption under section 366.26, subdivision (c)(1)(B)(i). The court rejected the argument. The court noted that Mother "has visited and had contact." However, while there was thus "some basis to say she's visited regularly, . . . that's pretty much as far as it goes." The court further indicated that termination of the parental relationship would not be detrimental to the children. The court then terminated parental rights and selected adoption as the permanent plan.

## II. ANALYSIS

At a section 366.26 hearing, the juvenile court determines a permanent plan of care for a dependent child. (*In re Celine R.* (2003) 31 Cal.4th 45, 52-53; *In re Casey D.* (1999) 70 Cal.App.4th 38, 50.) Adoption is the permanent plan preferred by the Legislature. (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 573.) "'Only if adoption is not possible, or if there are countervailing circumstances, or if it is not in the child's best interests are other, less permanent plans, such as guardianship or long-term foster care considered.' [Citation.]" (*Id.* at p. 574.)

10

"Once the court determines the child is likely to be adopted, the burden shifts to the parent to show that termination of parental rights would be detrimental to the child under one of the exceptions listed in section 366.26, subdivision (c)(1)." (*In re S.B.* (2008) 164 Cal.App.4th 289, 297.)  In this case, Mother argued that the beneficial parental relationship exception under section 366.26, subdivision (c)(1)(B)(i) applies.

The beneficial parental relationship exception applies when there is "a compelling reason for determining that termination would be detrimental to the child" because the parent has "maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).)  To prove the existence of a beneficial parental relationship, the "parent must do more than demonstrate 'frequent and loving contact[,]' [citation] an emotional bond with the child, or that parent and child find their visits pleasant.  [Citation.]" (*In re Derek W.* (1999) 73 Cal.App.4th 823, 827.)  The parent must show that the "relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents.  In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer.  If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*In re Autumn H., supra,* 27 Cal.App.4th at p. 575.)

In reviewing challenges to a trial court's decision as to the applicability of the parental relationship exception, we will employ the substantial evidence or abuse of discretion standards of review depending on the nature of the challenge. (*In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1315-1316.) We will apply the substantial evidence standard of review to evaluate the evidentiary showing with respect to factual issues. (*Id.* at p. 1315; §§ 366.26, subd. (c)(1)(B)(i), (v).) However, a challenge to the trial court's determination of questions such as whether, given the existence of beneficial parental relationship, there is a compelling reason for determining that termination of parental rights would be detrimental to the child "is a quintessentially discretionary determination." (*In re Scott B.* (2010) 188 Cal.App.4th 452, 469.) We review such decisions for abuse of discretion. (*Ibid.*) In the dependency context, both standards call for a high degree of appellate court deference. (*Ibid.; In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351.)[2]

Regarding the threshold requirement of maintaining regular visitation and contact with the children, the court expressly found that Mother visited regularly with the children. Although Mother missed some visitation appointments, her testimony indicates that the missed visits were rare exceptions to a regular visitation schedule of twice each

---

    [2] As the *In re Jasmine D.* court noted: "The practical differences between the two standards of review are not significant. '[E]valuating the factual basis for an exercise of discretion is similar to analyzing the sufficiency of the evidence for the ruling. . . . Broad deference must be shown to the trial judge. The reviewing court should interfere only "'if [it] find[s] that under all the evidence, viewed most favorably in support of the trial court's action, no judge could reasonably have made the order that he did.' . . .'" [Citations.]" (*In re Jasmine D., supra,* 78 Cal.App.4th at p. 1351.)

week in the eight months leading up to the section 366.26 hearing. The court's finding regarding this point is thus supported by substantial evidence.

There is conflicting evidence as to whether the parental relationship was beneficial to the children. Mother testified to positive visits with the children where they play games and watch movies, and the children call her mommy. The social worker, however, described visits between Mother and the children as "detrimental," and "negative and chaotic." The description of the visits, summarized above, indicate that Mother struggled to create a close parental bond with the children. Mother needed the assistance of FFA staff to supervise and keep the children safe. She brought large quantities of snacks and became upset when the children did not want to eat. A. would withdraw from Mother and cry by the end of visits. The younger children displayed behavior indicating their displeasure with the visits and a desire to return to the home of their caregiver. Such evidence supports the court's implicit finding that Mother and the children do not have the kind of relationship contemplated by the beneficial parental relationship exception to adoption.

Significantly, there is no substantial evidence of any detriment to the children as a result of termination of parental rights. Indeed, when A., the eldest, was asked about the possibility of adoption, he told the social worker that he likes living at the home of the prospective adoptive parents and did not want to leave. Although the younger children were too young for that conversation, the social worker noted that they "appear happy, bonded, and loved in the home. They look to the prospective adoptive parents for care,

13

comfort, and guidance when they have a need and those needs are met by the prospective adoptive parents." The evidence thus provides no compelling reason for determining that adoption and the termination of parental rights would be detrimental to the children.

For the foregoing reasons, we conclude the court did not err in ruling that the beneficial parental relationship exception to adoption did not apply.

### III.  DISPOSITION

The orders appealed from are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

KING              

J.

We concur:

RAMIREZ         

P. J.

McKINSTER      

J.